## HANKS v. MAGNOLIA PETROLEUM CO.
### (No. 498.)

Court of Civil Appeals of Texas. Eastland.
Dec. 7, 1928.

On Rehearing, Feb. 1, 1929.

Scarborough & Wilson, of Abilene, for appellant.

W. H. Francis and A. S. Hardwicke, both of Dallas, and Conner & McRae, of Eastland, for appellee.

FUNDERBURK, J. This suit involves primarily a question of the proper construction of a written instrument, which, omitting signatures, reads as follows:

"This agreement, made and entered into this 17th day of November, A. D. 1908, by and between J. T. Miller, of the county of Stephens and state of Texas, party of the first part, and S. M. Hanks, of the county of Stephens and state of Texas, party of the second part, witnesseth: That the said party of the first part for and in consideration of the sum of one dollar to him in hand well and truly paid, the receipt of which is hereby acknowledged, and in further consideration of the covenants and agreements hereinafter mentioned does covenant and agree to lease and by these presents has leased and granted the exclusive right unto the party of the second part, his heirs or assigns, for the purpose of operating and drilling for petroleum gas, coal, gold, silver, copper or any other mineral or mineral substances, all of those certain tracts or parcels of land lying and being situated in Stephens county, Texas, and described as follows:

"First Tract. Being the E½ of the NE¼ and the N½ of the SE¼ of section 17, Lunatic Asylum land.

"Second Tract. Being the NW¼ of section number 18, Lunatic Asylum land, all being the same land as conveyed to said J. T. Miller by J. W. Cooper and wife and said tracts of land containing altogether three hundred and twenty (320) acres more or less.

"The said party of the second part, his heirs or assigns to have and to hold the said premises for and during the term of one year from the date hereof and provided that if gas, petroleum, coal, gold, silver, copper or any mineral or mineral substance of any kind whatsoever is found within the said one year in paying quantities then in that event this lease shall continue so long thereafter as said product or products can be produced in paying quantities.

"It is especially agreed and stipulated by and between the parties herein that if any of the products herein named or any other mineral or mineral substances is found in paying quantities within the time herein specified, to wit, within one year from the date hereof, then in that event the said J. T. Miller, party of the first part, and the said S. M. Hanks, party of the second part, shall become joint

and equal owners of same, the party of the second part is to and has the right to remove any machinery, fixtures and buildings placed on said premises by party of the second part or those acting under him, and is not to put down any well on the land hereby leased within 200 yards of the buildings now on said premises without the consent of the said party of the first part, it is further especially agreed and stipulated that the said party of the first part is to fully use and enjoy the said premises for the purposes of tillage and pasturage except such part as shall be necessary for such mining purposes and the right of way over and across said premises to the place or places of mining or operating.

"The party of the second part agrees to commence operations within six months from the execution of this lease or in lieu thereof thereafter to pay to the party of the first part five cents per acre per month until work is commenced.

"It is further agreed that the second party, his heirs or assigns shall have the right at any time to surrender this lease and be released from all moneys due and conditions unfulfilled then and from that time this lease and agreement shall be null and void and no longer binding on either party and the payments which shall have been made be held by the party of the first part as full stipulated damages for the nonfulfillment of the foregoing contract and all the conditions between the parties hereunto shall extend to their heirs and assigns."

S. M. Hanks, the lessee or grantee in the foregoing instrument, brought suit against Magnolia Petroleum Company to recover judgment establishing his asserted right and title to one-half of the gas and coal in the land described in the instrument, and for a money judgment for one-half of the value of the gas taken from the land by defendant. The case was tried before the court without a jury, and, judgment being for defendant, plaintiff has appealed.

The court found that in 1909 Hanks, in compliance with the terms of the above contract, drilled a well on the land to a depth of 200 feet and discovered petroleum gas amounting to 1,000,000 cubic feet per day; that no further efforts were made to drill or prospect for or discover minerals, or to produce or market same after 1909; that, in fact, no minerals were ever marketed, there being no market at the time the well was drilled; that Hanks, in 1909, capped the well and moved the drilling machinery from the land, but has at all times since claimed a one-half interest in the gas in said land.

The court further found, based upon agreement of the parties, that the fee title to the land, including all oil, gas, and other minerals, by regular chain of warranty deeds from the sovereignty of the soil, was in defendant, Magnolia Petroleum Company, charged only with such rights as plaintiff, Hanks, may have under the above-mentioned contract, J. T. Miller being one of the fee owners in defendant's chain of title; that the defendant, Magnolia Petroleum Company, and its predecessors in title, have been in actual possession of said land for more than 10 years immediately preceding the filing of the suit on the 18th day of February, 1926; that defendant's title came through an oil and gas mining lease dated October 2, 1916, executed by J. M. Rush and wife, which defendant owns by due assignment, and under which defendant entered upon said realty described in the lease and began the drilling of wells for the discovery of oil and gas, completing the first well November 5, 1920, which resulted in the production of oil and gas in paying quantities, and which drilling operations and the production of oil and gas had continued up to the date of the trial.

The court further found that no gas was utilized from the lease until January 27, 1923, except such gas as was used for the operation of said lease; that from the 27th day of January, 1923, to December 5, 1927, both dates inclusive, the defendant, Magnolia Petroleum Company, produced and appropriated an average of 1,282,698 cubic feet of gas per day, of the market value of 6 cents per 1,000 cubic feet, at the mouth of the well, or of the value of $76.90 per day; that the defendant has continuously been in actual possession of said premises since prior to January 1, 1921, drilling and producing oil and gas from said premises from that time to the date of the trial, and claiming to own fee-simple title to said minerals as against every person whomsoever, and paid all taxes on said land and the minerals in and under the same as they accrued, and that defendant was in possession of said premises and all minerals at the date of the trial, producing such minerals from said land.

Based upon the foregoing facts, the court concluded that plaintiff had lost his interest in the land by abandonment, and further that defendant had title to the minerals under the 5-year statute of limitation. The court also concluded that the defendant had good title to the minerals by regular chain of conveyances from the common source of title, and that the instrument hereinbefore set out cast a cloud upon defendant's title, which the defendant was entitled to have canceled and removed.

■ Our construction of the instrument under which the plaintiff claims is that it granted to the plaintiff, S. M. Hanks, the exclusive right and option to enter upon the land and explore same for the discovery of any and all minerals therein for a period of time beginning with the date of the instrument and ending one year from said date. If such exploration resulted in the discovery of any minerals in paying quantities within said time, such fact constituted a condition precedent to the vesting in the said Hanks of an undivided one-

half interest in the particular mineral or minerals thus discovered. The work of exploration and discovery was at the same time the consideration for the grant of said interest in minerals discovered. The estate thus conveyed upon condition precedent was not one by fee-simple title. After the happening of the condition precedent, the estate vested in Hanks was a determinable fee title to the one or more minerals discovered in paying quantities. The qualification to the estate thus granted, that has the effect of debasing it from an otherwise fee-simple title, is the limitation expressed in the instrument which reads: "If gas, petroleum, coal, gold, silver, copper or any mineral or mineral substance of any kind whatsoever is found within the said one year in paying quantities then in that event this lease *shall continue so long thereafter as said product or products can be produced in paying quantities.*" (Italics ours.)

Under the findings of the court, the condition precedent was performed by the discovery within the time specified, of gas capable of being produced at the rate of 1,000,000 cubic feet per day. The further finding of the court that, at the time of the trial the lease was producing gas in paying quantities, shows that the estate consisting of the undivided one-half interest in the gas had not terminated under the limitation that the estate was to continue "so long thereafter as said product or products can be produced in paying quantities."

Appellant challenges the conclusion of the trial court that his title in and to one-half of the gas had terminated by abandonment of all operations for the discovery, production, and marketing of gas. We believe that this contention should be sustained. As regards the liability of an estate to termination or extinguishment by abandonment, there is no distinction between a fee-simple estate and one that is a determinable fee. "The owner of a determinable fee has all the rights of an owner in fee simple, with the same rights of user and power to commit unlimited waste." Tiffany, Real Property, vol. 1, p. 336. The only distinction is: "If he conveys his estate, the grantee takes it, subject to the liability to termination as existed before the grant." Id.

As said in Corpus Juris: "Until its determination such an estate has all the incidents of a fee simple, and while this estate continues, and until the qualification upon which it is limited is at an end, the grantee or proprietor has the same rights and privileges over his estate as if it was a fee simple. He has an absolute right to the exclusive possession, *use* [italics ours] and enjoyment of the land and as complete dominion over it for all purposes as though he held it in fee simple." 21 C. J. 923.

Ownership, as applied to a fee-simple title, means exactly the same as that term does when applied to a determinable fee title. In either case it means "* * * dominion of a thing real, * * * corporeal or incorporeal," which one "has the right to enjoy and to do with as he pleases, * * * either to spoil or destroy it as far as the law permits, * * * unless he be prevented by some agreement or covenant which restrains his right. 29 Cyc. 1549.

Mere nonuser of a freehold estate of inheritance, which a determinable fee certainly is, cannot result in an extinguishment of the estate. Only in a case where a qualification in the nature of a limitation annexed to an otherwise fee-simple estate provides for a continued user, as, for instance, a continuation of drilling, producing, or marketing of minerals, would the failure to drill produce or market terminate the estate. For instance, instead of the limitation to the estate which we are considering, and which we have above quoted, if the parties had provided, "shall continue so long thereafter as said product or products are being produced by the lessee in paying quantities," the failure to produce in paying quantities would terminate the estate, not because of an abandonment, but because of the happening of the condition that was to mark the end of the estate. "The qualification on which the estate is to determine must be found in the instrument creating the estate." 21 C. J. 922.

There is wholly absent from the instrument under consideration any provision that the estate is to continue only so long as the lessee continues work of exploration, production, or marketing of the products. In the early case of Dikes v. Miller, 24 Tex. 417, at page 424, the Supreme Court had occasion to consider what character of estates were liable to extinguishment by abandonment. It was said: "Easements and incorporeal rights annexed to land, may be lost by abandonment. So may an incipient right to land, as a location and survey, or other merely equitable title, not perfected into a grant, or vested by deed. 4 Kent, Com. 448; [Hatch v. Dwight] 17 Mass. 297 [9 Am. Dec. 145]; [French v. Braintree Mfg. Co.] 23 Pick. [Mass.] 215 [216]; [Philips v. Shaffer] 5 Serg. & R. [Pa.] 215; 2 Hilliard on Real Property, 3, 12, 13, 79, 98. Legal rights, when once vested, must be divested according to law, but equitable rights may be abandoned."

It will be observed that the instrument under consideration lacks some of the technical requirements necessary at common law to constitute a deed. It clearly evidences, however, an intent to vest in Hanks, upon the happening of a named contingency, a one-half interest in the minerals discovered, in place, and this is sufficient. The courts of this state are clearly committed to the view that an instrument which has for its purpose the vesting in a grantee of the exclusive right to take and use minerals constitutes the conveyance of an interest in land. Texas Co. v. Daugherty, 107 Tex. 229, 176 S. W. 717, L. R. A.

1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 292, 29 A. L. R. 566.

It is provided in R. S. 1925, art. 1291: "Every estate in lands which shall thereafter [hereafter] be granted, conveyed or devised to one, although other words heretofore necessary at common law to transfer an estate in fee simple be not added, shall be deemed a fee simple, if a less estate be not limited by express words or do not appear to have been granted, conveyed or devised by construction or operation of law."

If, then, without the limitation mentioned, the estate would, under the operation of this statute, be a fee simple, it would seem to follow that, although by the limitation the estate is made a determinable fee, it is certainly that, regardless of the want of formal words of conveyance deemed necessary at common law. In so far, therefore, as the judgment of the court is predicated upon the conclusion that appellant had abandoned his interest in the land, we think the same is erroneous.

■ It remains to consider the question of limitation. We have found it difficult to reach a satisfactory conclusion as to the extent, if any, or conditions upon which, the appellant Hanks is chargeable with notice of the registration of the lease under which defendant claims title to the minerals. Hanks and his grantor, Miller, were, after the discovery of gas in paying quantities, tenants in common of the gas in place in the land. Would a subsequent conveyance by Miller of more than a one-half interest in the gas be constructive notice to Hanks that he or his grantee were claiming adversely to Hanks? Authority seems not entirely wanting that the mere registration of such deed constitutes notice. Clayton v. Humble Oil & Rfg. Co. (Tex. Civ. App.) 291 S. W. 601.

Very good authority will be found in support of the proposition that, where one tenant in common executes a deed purporting to convey the entire premises to a third person, who enters into possession thereof, claiming title to the whole, this will constitute disseizin of the cotenants and after the expiration of the statutory period will bar the right of the cotenants to recover. McBurney v. Knox (Tex. Com. App.) 273 S. W. 819; Olsen v. Greele (Tex. Civ. App.) 190 S. W. 240; Olsen v. Grelle (Tex. Com. App.) 228 S. W. 927.

We believe, however, that even so broad a statement of the rule as this must be applied with some discrimination to a state of facts similar to one before us. In White v. McGregor, 92 Tex. 556, 50 S. W. 564, 71 Am. St. Rep. 875, it is said: "The object of all the registry acts, however expressed, is the same. They were intended to affect with notice such persons only as have reason to apprehend some transfer or incumbrance prior to their own, because none arising afterwards can, in its own nature, affect them; and after they

have once, on a search instituted upon this principle, secured themselves against the imputation of notice, it follows that every one coming into their place by title derived from them may insist on the same principle in respect to himself. It is a general rule that when once a man has granted away his right, anything which he can do or say shall never be received to affect another claiming under him."

In Gann v. Phillips (Tex. Civ. App.) 268 S. W. 1060, the court holds that a lienholder is not affected with notice of subsequently recorded deeds or of actual possession of the vendees under such deeds.

In Freeman v. Pierce (Tex. Civ. App.) 250 S. W. 778, it is held that the giving and recording of deeds of trust on the entire property by one tenant in common cannot be said to give notice of adverse claim to other cotenants.

In Leonard v. Benfford Lumber Co., 110 Tex. 83, 216 S. W. 382, the Supreme Court remarked that our statute bears a settled construction, under which registration of an instrument carries notice of its contents only to those bound to search for it, among whom are subsequent purchasers under the grantor in the recorded instruments.

In Biswell v. Gladney, 213 S. W. 256, the Commission of Appeals holds that a purchaser of a mortgage note is required to look only to the record to ascertain whether the mortgagor had a good title at the time the mortgage was executed, and whether the mortgagee has released the lien in whole or in part or made any other contract affecting it, and he is not bound to search the records to ascertain subsequent conveyances by the mortgagor and no duty arises as to subsequent vendees of the mortgagor until he has actual notice of such conveyance.

In Werts' Heirs v. Vick (Tex. Civ. App.) 203 S. W. 63, it is said: "The owner of the land is not required to constantly examine the records, to ascertain whether some one has placed of record some instrument affecting his title. If possession of the land is disturbed, he is bound by notice of such fact, and by virtue of the limitation statutes may then be said to be affected with notice of the claim evidenced by the deed under which the possession was taken."

In Lynch v. Lynch (Tex. Civ. App.) 130 S. W. 461, it is held that registry of deeds alone from one tenant in common to his wife is not notice to the other cotenants, being the grantor's children.

■ If a purchaser is not chargeable with notice of conveyances, except such as are made prior to his purchase by his immediate vendor, or any remote vendor through whom he derives his title, how can one cotenant be chargeable with a subsequent conveyance by another cotenant? The answer, we think, must be that registration only is not notice. In such case a cotenant becomes chargeable

with notice of the terms of another cotenant's registered conveyance only because he finds a stranger in possession of his lands, and thereupon becomes charged with the duty of making proper inquiry to ascertain by what authority the possession is held. The fact of possession raises the question: Does the stranger hold as a cotenant by virtue of having succeeded only to the estate of the former cotenant and which would render his possession, therefore, not necessarily adverse; or does he claim by some other right which may be adverse? The raising of the question imposes the duty to search the records, and the law charges knowledge of all the records show. If the record shows that the stranger in possession holds under a conveyance of only such interest as the former cotenant had, then in the absence of actual notice to the contrary, or other facts from which notice of an adverse claim will be presumed, the statute of limitations will not begin to run. If the record shows that the possession is held under a muniment of title purporting to convey the entire interest in the property, this constitutes notice of the adverse claim.

■ The question may be regarded as settled that, after a severance of the mineral estate in land, the possession of the land by a grantee of one of two or more cotenants, even though the conveyance to him purports to convey the entire interest, does not charge the other cotenants with notice of an adverse claim to the minerals so as to start the running of limitations. Wallace v. Hoyt (Tex. Civ. App.) 225 S. W. 425; Southwestern Lumber Co. v. Evans (Tex. Civ. App.) 275 S. W. 1078; Prince v. Frost-Johnson Lumber Co. (Tex. Civ. App.) 250 S. W. 785; Lyles v. Dodge (Tex. Civ. App.) 228 S. W. 316.

■ The application of this principle, we think, requires us to hold that drilling operations on the part of appellee for the production of oil or any other mineral than those in which appellant was granted an interest by virtue of his prior discovery of same, would not constitute notice of an adverse claim to the gas in the land. Only the "actual, continued, visible, notorious, distinct, and hostile" possession of the gas, could result in a bar of appellant's interest by limitations. We do not think that the court's findings, which must be looked to for support of the judgment, show such adverse possession, at least, prior to January 27, 1923, the time when appellant began to utilize the gas for commercial purposes. Nor do we think there is any evidence showing such distinct appropriation of the gas, prior to that time, as would support a finding of adverse possession. The judgment of the court being based upon a finding of five years limitation, it will be seen that such period necessarily covers some time prior to January 27, 1923, since the suit was filed February 18, 1926.

■ The registration of the lease from Rush and wife to the predecessors of appellee is, we think, of little or no value on the question of notice of an adverse claim by appellee. Should it be conceded that appellee took such possession of the gas as to impose upon appellant the duty of inquiry, a search of the records would not have shown with certainty that appellee claimed the entire interest in the gas. The grant to appellee made by the lease under which it claims title to the minerals was of "all the oil, gas and other minerals in and under" the land, "to which the grantors have good title." The succeeding words of warranty may render the identity of the interest conveyed somewhat ambiguous, but we question if the very fact of ambiguity would not destroy the conclusiveness of the lease as notice of an adverse claim. It seems to us that the presumption ought to obtain that one cotenant would not attempt to convey more than his individual interest, and when the other cotenant, upon making an investigation to see if he had done so, found that the conveyance was susceptible to a construction in harmony with the presumption, it ought not to be held conclusive, at least, of notice to the contrary.

We have, therefore, reached the conclusion that, as to the question of limitation, it is necessary to reverse and remand the case; and it is accordingly so ordered.

Reversed and remanded.

### On Rehearing.

Appellee insists that the effect of our opinion is that Hanks would, after discovery of minerals within the specified time, thereafter continue to have exclusive right, even as against the other tenant in common, to operate and produce same, and that, if he chose not to do so, Miller and his assigns would thereby be deprived of such benefits of their ownership of the other one-half interest as would result from production. We do not hold that, after discovery of minerals within the specified one year's time, Hanks continued to have the exclusive right to explore for and produce the minerals. On the contrary, it is our view that, as to such minerals as were discovered in paying quantities within the year, Hanks and Miller became tenants in common, each owning one-half of such minerals, without any working agreement, thereafter operative. The "exclusive right" granted by the instrument to Hanks was limited to one year's time, when it wholly ceased. If thereafter Hanks had any interest in the land, it was that of a tenant in common as to one-half of the minerals discovered and as to which he had no other or different rights than the other cotenant. After the one year's time and the discovery of minerals, only a very few of the contractual provisions of the grant remained operative. The term of the grant, the right and duty of Hanks to remove machinery, buildings, etc., and the reservation of certain surface rights to Miller would constitute almost a complete list of such provisions

remaining in operation after Hanks became vested with a one-half interest in minerals discovered.

The provision of the lease which, in our opinion, completely distinguishes its nature from those construed by the Supreme Court in Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, and Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304, 255 S. W. 601, and like cases, is that reading: "* * * If any of the products herein named * * * is found in paying quantities within the time herein specified, to wit, within one year from the date hereof, *then in that event* the said J. T. Miller * * * and S. M. Hanks * * * shall *become* joint and equal owners of the same."

Without this provision we would hold, under authority of the above decisions of the Supreme Court, that the instrument by its execution and delivery vested immediately title in the minerals. It is undeniable, however, that such effect is one resulting from construction, rather than express provisions. But the clause last above quoted carries positive negation that the title vested in the beginning. To give effect to this portion of the instrument it must be construed to show that title vested only when minerals were discovered, and expressly upon condition of this discovery within a specified time.

On the question of limitation appellee very forcefully emphasizes the contention that the findings of the court which are unchallenged include every fact which even we hold to be necessary, in order to show the bar of appellant's suit by the five-year statute of limitation. The trial court found that defendant had fee-simple title to the land, including the gas (except as affected by appellant's rights), and that under a lease from an assignee of Miller the appellant in 1920 "began the drilling of a well for oil and gas and continued the drilling of wells on said realty for the discovery of oil and gas, until 10 wells had been drilled, the first of such wells having been completed on November 5, 1920, which resulted in the production of oil and gas in paying quantities and thereafter continued the drilling of oil and gas wells on said premises until four wells had been completed during the year 1921, which resulted in the production of oil and gas in paying quantities. * * * Defendant has continuously been in actual possession of said premises since prior to January 1st, 1921, prospecting, drilling, and producing oil and gas from said premises continuously to the present time and claiming to own the fee simple title to said minerals in and under said lands as against every person whomsoever, paying all taxes on said lands, and the minerals in and under same as the same accrued and is now in possession of * * * all minerals and producing such

minerals from said land * * * that the original petition of plaintiff was filed on the 18th day of February, 1926."

Such findings are based upon, and are in the language of, an agreement as to the facts, signed by appellant's counsel. In our original opinion we construed a further finding that "no gas was utilized from this lease until January 27, 1923, except such gas as was used for the operation of said lease," as so limiting the finding above stated as to leave the finding uncertain that there had existed for the requisite time that open and continuous adverse possession necessary to constitute a bar. After further consideration we have decided that the proper construction of the finding last quoted does not justify the conclusion that it limits the other findings in any material respect. To so hold would, no doubt, subject the opinion to the criticism that we had decided that there could be no adverse possession of minerals, in the absence of the use of same off the premises where produced. We do not intend so to hold, and, being of the opinion that appellant has agreed to all the facts necessary to show limitation, the judgment of the court in so far as based thereon should be affirmed.

Appellee's motion for rehearing is therefore granted, our former judgment reversing and remanding the cause will be set aside, and the judgment of the trial court will be affirmed.